UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

RANDY CLEARY,
     Plaintiff,

 -vs-                          Case No. 12-11988
                                 Hon. Lawrence P. Zatkoff
                                 Magistrate Judge: Mark A. Randon

DANIEL HEYNS,
*et al*.
     Defendants.


**RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

     For the reasons set forth in the brief below, Randy Cleary requests that the Court deny

Defendants' motion for summary judgment.


                  Respectfully Submitted,


                  By:  s/ Ian B. Lyngklip
                  Ian B. Lyngklip P47173
                  LYNGKLIP & ASSOCIATES
                  CONSUMER LAW CENTER, PLC
                  Attorney for Randy Cleary
                  24500 Northwestern Highway, Ste. 206
                  Southfield, MI 48075
                  PHONE:  (248) 208-8864
                  Ian@MichiganConsumerLaw.Com

Dated: June 4, 2013

## BRIEF IN SUPPORT OF
## RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### Introduction

Since 1987, the State of Michigan and its instrumentalities have falsely accused Mr. Cleary

of multiple crimes, publicly slandered his name, prevented him from obtaining employment, arrested

and imprisoned him, suspended and revoked his driver's license, and forced him to pay hundreds

of dollars of fines and attorney's fees for crimes he did not commit.[1]  At the outset of their brief, the

Defendants concede that these facts represent a terrible injustice worked upon Mr. Cleary.  While

recognizing that Mr. Cleary has been the victim of an identity theft, the Defendants proceed to argue

that Mr. Cleary has somehow failed to avail himself of the remedies that would have prevented this

terrible turn of events, and that he is somehow the cause of this harm to himself.  This – Defendants

argue – however unfortunate is all Mr. Cleary's own fault.

While conceding that Mr. Cleary still  does not have his driver's license, and that his name

continues to be associated with a career criminal – Bennie Ray Parker – the State still refuses to

restore Mr. Cleary's privileges, correct its records so that he can obtain  employment, or change the

way that it requires state-licensees to use the State's data base.  Simply put, the State claims that it

need do nothing to correct this situation.  And indeed, that is precisely what they have done thus far.

With each passing day, the Defendants compound Mr. Cleary's problem, preventing him from

working and moving forward like the other law-abiding citizens of the state.  Through their failure

to even recognize that this situation is *their* problem to fix, the Defendants have relegated Mr. Cleary

---

[1]Mr. Cleary has set forth a portion of this history in his own motion for partial summary judgment (R.27).  In the interest of brevity, Mr. Cleary incorporates that statement of fact by reference, and sets forth in this brief those facts relevant to this motion that have not been stated there.

1

to lead the life of a convicted felon, while having committed no crime.  For the reasons that follow, Mr. Cleary requests that the Court deny the summary judgment motion of the Defendants and permit the matter to proceed to trial.

### Mr. Cleary's Application to Hudson Manor

After the Secretary of State suspended Mr. Cleary's driver's license on August 26, 2011, Mr. Cleary could no longer work as a truck driver.  (See R. 27).  Consequently, in September he applied for work at New Hudson Manor, an adult foster care facility where his girlfriend worked.  As a state-licensed facility, the Department of Human Services (DHS) required New Hudson Manor to conduct a background check on all persons who it had agreed to hire.  See M.C.L. § 337.20173.  (Deposition of Erin Dittmer, Exhibit 2, p. 17).

According to DHS practice, that background check proceeded through a two-step process. In the first step called a "preliminary check," New Hudson Manor keyed Mr. Cleary's identification information into the DHS web site.  (Exhibit 2, p. 16 and 43-44).  In turn, the DHS web site then checked the OTIS database operated by the Department of Corrections (DOC).  That database returned results matching Mr. Cleary's name and birthday with the alias of a known felon, Bennie Ray Parker.  When the DHS system returned a match for Mr. Cleary's name against known aliases of Parker, DHS rules immediately disqualified Mr. Cleary from employment with a DHS-licensed facility (see Exhibit 2, p. 51-52, 63-64; Exhibit 10).

Because DHS policy required New Hudson Manor to disqualify Mr. Cleary from employment, Mr. Cleary never reached the second step of the screening process, a fingerprinting which would have established that he was not – *in fact* – the individual who committed the crimes. (see Exhibit 2, p. 28).  And, because Mr. Cleary never  reached the second stage of screening, DHS

2

policy provided him with no right of appeal (see Exhibit 2, p. 69).

## The Relationship between DOC Data and the DHS

DHS requires that its licensees conduct background checks against the DOC offender database (OTIS). (see Exhibit 2, p. 21).   Under current DHS practices, a person whose name matches the alias of an offender on the OTIS system is excluded from employment.  (see Exhibit 2, p. 45).  DHS makes this database available to its licensees through a web site designed to deliver background checks for the department.[2]  (see Exhibit 2, p. 17 and 29).   The data provided by the DOC is housed and serviced by the Department of Management, Budget and Technology (DTMB). (Deposition of Kimberly Woods, Exhibit 3, p. 13 and 19).  DTMB has the ability to take the OTIS system offline. In this same respect, DOC has no ability  to turn off the OTIS database (Exhibit 3, p 14).  Consequently, in the event that Mr. Cleary has an issue with data provided by DTMB on behalf of DOC, Mr. Cleary needs to take it up with DOC.  (Exhibit 3, p. 33).

## DOC Data Quality and Correction Procedures

While DHS relies upon the DOC to provide data for its employment screening database, the record evidences establishes that DOC's database is not accurate or reliable for those purposes, nor is it designed to be.  (OTIS Disclaimer, Exhibit 9).   While DTMB maintains the system, it has no policy, procedure or practice to protect people from identity theft relating to the system  (Exhibit 3, p. 31) and the issue of identity theft has never come up at any of the meetings between DTMB and DOC to discuss operational issues.  (Exhibit 3, p. 31.).  DTMB claims that it has no authority to alter the data of the DOC.  (Exhibit 3, p. 14).  Perhaps this explains why DHS applicants complain of being mistakenly associated with felonies on a nearly monthly basis. (see, Exhibit 2, p. 14 and 35).

---

[2] www.miltcpartnership.org

DOC recognizes that aliases are used in many occasions by criminals who are convicted (Diana Judge Transcript, Exhibit 8, p. 33 and 68-69).  That database simply reflects that an individual with a given name was in the custody of DOC at the time of their conviction by a Court (Exhibit 8, p. 69).  The name that appears could be an alias or true name; the DOC does not have a high degree of certainty that the individuals identified in the OTIS database are who they say they are.  (Exhibit 8, p. 74). Nor do they know if the other identification information on their database is true.  (Exhibit 8, p. 82-84).  Rather, fingerprints are matched to a unique ID number, and the identifiers that display on OTIS only represent the identification associated with the longest sentence given to the convict with that SID number.  (Id.)

As for correction procedures,  DHS does not require its licensees to use the photographic information or physical description of the offender (available through the website and OTIS) to determine if there is a match.  (see Exhibit 2, p. 43, 46)  If the applicant complains to DHS that the association with the felon is an error, that individual has no right of appeal if the application has not proceeded passed the preliminary check.  (see Exhibit 2, p. 40-41)  Rather, the DHS shifts the burden to the applicant and requires that person to take the matter up with the repository that supplied the data: OTIS.  (see Exhibit 2, p. 31, 33-34, and 45).  If OTIS refuses to change its database, the DHS will not lift the exclusion (see Exhibit 2, p. 38) even though the statue does not prescribe any particular matching criteria (see Exhibit 2, p. 59-60) and the department has discretion to allow an application to proceed in spite of a match (see Exhibit 2, p. 47).

For its part, OTIS refers people who complaint about their name appearing on OTIS are directed to the State Police to initiate a record challenge.  (Exhibit 8, p. 65).  But even if the record challenge is successful, DOC will not make any change to its records.  (Exhibit 8, p. 72).

1.      **The State of Michigan has taken Mr. Cleary's license without providing a hearing in violation of procedural Due Process.**

For purposes of its motion, Ms. Johnson concedes that the taking of Mr. Cleary's driver's licence implicates a protected property interest.  (Def.'s Memo, at 12; R. 27, Pg ID 327).  While conceding this point, the State, nonetheless argues that it had no duty to provide a pre-deprivation hearing, and the State's post-deprivation appeal process meets the requirement of Due Process.  Mr. Cleary addresses these issues as follows.

a.      ***Due Process* required that the State provide Mr. Cleary with a pre-deprivation hearing where it had the ability and time to do so.**

The Supreme Court *presumptively* requires that the state provide pre-deprivation process where it can *feasibly* do so.  *Hudson v. Palmer*, 468 U.S. 517 (1984); *see also, Parratt v. Taylor*, 451 U.S. 527, 539 (1981); *Harris v. City of Akron*, 20 F.3d 1396, 1401 (6th Cir.1994) ("The touchstone of the *Parratt* rule is the impossibility or impracticability of providing predeprivation process combined with provisions for adequate postdeprivation process.").  Pre-deprivation hearings serve as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the [plaintiff] are true and support the proposed action"  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985).

In order to determine whether *Due Process* requires a pre-deprivation hearing, the court must balance three factors:

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v Eldridge*, 424 U.S. 319, 335 (1976).   The Court must analyze and weigh each of these

factors in order to determine whether the SOS violated *Due Process* by refusing to provide a hearing.

### i.     Mr. Cleary had a substantial interest in maintaining his commercial driver's license.

Mr. Cleary is a truck driver by trade who has possessed a CDL driver's license since 1991 (Exhibit 4, p. 92). In depriving Mr. Cleary of his license, the State has also deprived Mr. Cleary of his means of making a living.  Mr. Cleary has a protected interest in his license and livelihood. *Gilbert v. Homar*, 520 U.S. 924, 932 (1997).   The suspension at issue in this case has been indefinite, not temporary and remains in effect even now, more than 13 months after filing suit, and 22 months after the suspension first went into effect.  By any measure, Mr. Cleary has a substantial interest in maintaining his livelihood and engaging  in work in his chosen profession.

### ii.     The State's procedures for processing out-of-state suspensions presented and unduly high degree of risk of error.

The second prong of the *Matthews v Eldrige* test requires the court to examine the existing procedures in light of risks of reaching an erroneous result.  While SOS Johnson cites authority for the proposition that she may take a license without a pre-deprivation hearing, the cases she cites are inapposite.  Unlike the driver in  *Dixon v. Love*, 431 U.S. 105,113 (1977), Mr. Cleary never received a hearing on the underlying crimes for which his license was suspended.[3] And unlike the driver in *Mackey v Montrym, 443 US 1 (1979)*, Mr. Cleary's license has been suspended indefinitely without any hearing, either pre or post-deprivation. Simply put, the Court may not ignore the test in *Matthew v Eldrige*.  In this case, the evidence shows that the risk or  error is exceedingly high that suspension

---

[3]Defendant Johnson also cites *Illinois v. Batchelder*, 463 US 1122 (1983) for the proposition that a post-deprivation hearing is sufficient. However, in *Batchelder*, the driver was offered and received a pre-deprivation hearing.  The issue was the sufficiency of that hearing.

6

of Mr. Cleary's license, based on out-of-state convictions without a prior hearing is unlawful.

The record evidence establishes that the State's procedures in relation to out-of-state convictions are fraught with the likelihood of error for many people, and therefore Due Process requires the opportunity for a pre-deprivation hearing:

✗ Nearly ***1,000 people a year complain to the Secretary of State in writing about identity theft*** connected with driving privileged. (R.28-5)

✗ The records that the Secretary of State receives from out of state are not official court records, but rather abstracts prepared by a third party. (Deposition of Fred Bueter, Exhibit 4, p 8 and 98).

✗ Those abstracts are prepared by the DMV's of other states, and are not actual court records. (See E.g. 28-6)

✗ The Secretary of State seeks to validate only 2 out of 3 key pieces of data in the abstracts of convictions that it receives: Last Name, Date of Birth, and Driver's License Number. The Secretary of State ignores all other identifying information contained in the abstracts sent to it from other states. In other words, in the event that one of the identifiers examined does not match the Secretary's own records, the Secretary of State disregards this unmatched dated and conducts no further investigations to determine whether the foreign jurisdiction has could have misidentified the individual. (Exhibit 4, p.65-66, 68)

✗ The Secretary of State has no procedure to contact Michigan drivers before suspending their licenses based on out-of-state convictions. (see Def. Memo)

✗ The Secretary of State has no procedure to allow Michigan courts that alter or withdraw convictions arising out of identity theft to communicate that fact to Secretary of State. (Exhibit 4, p. 59-62)

✗ Conversely, the Secretary of State has no procedure to verify the identity of the person receiving ticket where a past victim of ID is the reported subject of that ticket. (Exhibit 4, p. 43-44 and 54-56)

✗ The Secretary of State does not have any policy, procedure or practice to require courts that submit conviction information to certify the identity of the individual who is ticketed. (Exhibit 4, p. 41-43)

✗ The Secretary of State has no procedure to flag the records of past victims of "ticket fraud" and identity theft to insure that these past victims do not become repeat victims. (Exhibit 4, p. 38)

These circumstances surrounding the suspension of licenses based on out-of-state convictions are fraught with the opportunity for error and fraud. ***In the face of a significant occurrence of identity thefts – over 1,000 written complaints per year – the Secretary of State accepts records which have none of the procedural safeguards that would ordinarily be associated with citations and convictions reported by Courts within Michigan.*** These multiple opportunities for error and the complete lack of any meaningful process after suspension demand that the State of Michigan provide a pre-deprivation process for challenging errors before the Secretary of State suspends a driver's license based on an out-of-state conviction.

### iii.    The State's interest does not outweigh procedures for processing out-of-state suspensions presented and unduly high degree of risk of error.

In this case, the now-indefinite suspension of Mr. Cleary's driver's license and effective prohibition on his working in his field represents a significant interest for which the Constitution provides protection. While the State of Michigan has an interest in removing poor or dangerous drivers from the road, that interest does not outweigh that of the individual where there is a significant risk of error, which cannot be challenged by either a pre-deprivation or post-deprivation process. The State suspends licenses based on out-of-state convictions after a deliberative process. As such, it must provide a pre-deprivations process. *Silberstein v. City of Dayton*, 440 F.3d 306, 316 (6th Cir 2006). To the extent that State of Michigan wishes to continue to suspend licenses based on out of state convictions, it must either adopt procedural safeguards to insure that it is not suspending licenses based on erroneous data, or else provide prompt and meaningful post-deprivation remedies for the restoration of those licenses. Having refused to take either of these paths, the Court should deny the motion to dismiss Mr. Cleary's procedural Due Process claim.

### b.    Michigan failed to provide meaningful notice or opportunity to be heard after

8

**suspending Mr. Cleary's licence based on an out of state conviction.**

The State claims that it provided an adequate post deprivation remedy to Mr. Cleary after suspending his license, including a right of appeal. Simply put, the State argues that Mr. Cleary has noone to blame but himself for his loss of license.   SOS Johnson claims that she provided Mr. Cleary an opportunity to appeal in her Order from August 26, 2011. But this document failed to provide information about the venue where the infraction occurred, the case number, or even the specific statutory violation. The information provided reads as follows:

> A CERTIFIED ABSTRACT OF COURT RECORD HAS BEEN RECEIVED BY THIS DEPARTMENT STATING THAT YOU WERE ARRESTED ON 6/14/2010 AND CONVICTED ON 08/01/2011 IN THE STATE OF GEORGIA FOR THE OFFENSE OF DRUG CRIME.
>
> PURSUANT TO M.C.L. § 257.319, IT IS THEREFORE ORDERED THAT YOUR DRIVING PRIVILEGE AND LICENSE BE:
>
> SUSPENDED FROM *09/11/2011* THRU MIDNIGHT OF *03/11/12*, M.C.L. § 257.320E REQUIRES THAT A REINSTATEMENT FEE OF $125 BE PAID TO THE SECRETARY OF STATE.

R. 28-8. This Order provides no information about the name of the court that entered the conviction, the case number, or where he could possible find that information. The Order later informs him that ***his only remedy is to seek an appeal the underlying conviction in the court that entered that conviction***, yet the letter provides no time frame within which to act, or a statement of how Mr. Cleary can proceed.

Any post deprivation remedy must include notice and the opportunity to be heard in a meaningful way. *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) ("[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") Without the name of the court, its location, the case number, and a description of the appeal process, the document completely fails the essential purpose of Due Process, namely *notice and a meaningful*

9

*opportunity to be heard. LaChance v. Erickson*, 522 U.S. 262, 266 (1988) ("The core of due process is the right to notice and a meaningful opportunity to be heard.") This document failed to provide that notice.[4]

> **c.   The State of Michigan provided only an illusory post-deprivation remedy after suspending Mr. Cleary's driver's license.**

While Ms. Johnson claims that the State provided Mr. Cleary with a post-deprivation remedy, this argument ignores both the legal framework for challenges to driving suspensions and the record evidence in this case.  Upon receipt of notice of conviction of a qualifying crime, the Secretary  of State must suspend the license of a Michigan driver.  M.C.L. § 257.319.  While the consequence of the conviction is mandatory, the administration of this provision is left to the discretion of the Secretary of State, and Mr. Fred Bueter has the authority to immediately restore Mr. Cleary's license (Exhibit 4, at 72-73).  This statutory framework does not provide Georgia the power to take any action with regard to licenses.  Michigan – acting on its own and under the discretionary

---

[4]Any claims that Mr. Cleary is himself to blame for his situation ring hollow in light of the history of this litigation.  The Secretary of State has demanded that Mr. Cleary be fingerprinted in the presence of its attorney, Ms. Geminick as a precondition of returning Mr. Cleary's license.  Mr. Cleary made himself available on October 31, 2012 and Counsel for the state cancelled.  (Exhibit 6.)   Next, Randy Cleary made himself available for fingerprinting following his deposition on December 19, 2012 which was held at the Brighton State Police Post for the very purpose of fingerprinting him after his testimony.  The State, however, failed to make appropriate arrangements to have the fingerprint technician available that day.  Mr. Cleary then offered to travel that day to the Howell Police Post for fingerprinting.  That technician was also unavailable.  Mr. Cleary offered to arrange to have his brother drive him back to the Brighton Post next day for fingerprinting but the State's attorney Ms. Geminick would *not* allow the procedure to proceed without her being present.  Since then, Mr. Cleary has repeatedly offered to appear under a stipulated order which would provide for the return of his license.  (See e.g. R. 29-2; Exhibit 7). The State has refused to respond.  Mr. Cleary last offered to be fingerprinted during the mediation session before Magistrate Judge Randon, offering to present himself to the US Marshall service that day while Ms. Geminick was present.  The State did not accept this offer.

administration of the Secretary of State – concluded that Mr. Cleary was the person who was convicted and suspended his license.  (*Accord*, Exhibit 4, at 72-73).

While Michigan law provides the Secretary of State with the authority and ability to provide an administrative appeal from the suspension of Mr. Cleary's Michigan license, the Secretary of State refuses to provide that appeal or any other hearing for Mr. Cleary. *See*, M.C.L. § 257.322. Similarly SOS Johnson has failed to cite even a single case which permits a state to satisfy *its own* Due Process requirements by referring a citizen to *another state.*

While the State of Michigan did indeed send a notice, that notice provided no meaningful information which would allow Mr. Cleary to challenge his suspension.  Even if Mr. Cleary could have somehow divined this information, the appeal in Georgia would have had no legal effect on the suspension, rather he would have had to have taken the matter up again with Michigan.  Thus, even though Michigan claims it gave Mr. Cleary notice and an opportunity to be heard, the remedy was available at best only in theory, and certainly not in reality.  *Monroe v. Pape*, 365 U.S. 167, 173-174  (1961) ( 1983 provides a remedy "where the state remedy, though adequate in theory, was not available in practice.")  Because the State of Michigan offered no process for challenging its own administrative action in suspending Mr. Cleary's license, Mr. Cleary may proceed on his procedural due process claim and the Court should deny the motion.

**2.**     **Mr. Cleary has stated an official capacity claim for deprivation of a fundamental right and protected interest.**

In its brief, the State argues that Mr. Cleary's official capacity claims fail, because he cannot identify any fundamental right or protected interest.  Additionally, the State claims that Mr. Cleary cannot establish that the State caused any harm to him.  A discussion of each of these issues follows.

**a.**     **The State actors had falsely defamed Mr. Cleary by falsely associating him with**

11

**criminal conduct so as to deprive him of employment.**

The State challenges Mr. Cleary's official capacity claim, arguing that as a matter of law, he has no constitutionally protected interests.  The Constitution provides protection for injury to a person's reputation, good name, honor, or integrity.  Specifically, individuals may assert a claim for injury to one's reputation in connection with a stigmatizing statements that causes loss of employment. *Paul v. Davis*, 424 U.S. 693, 709–10 (1976)  *Ludwig v. Board of Trustees of Ferris State University*, 123 F.3d 404, 410 (6th Cir.1997). *See also*, *Levin v. Childers*, 101 F.3d 44, 46 (6th Cir.1996).  In this case, Mr. Cleary has asserted that the State has interfered not once, but twice with his ability to obtain and maintain employment.  In the first instance, the Secretary of State suspended Mr. Cleary's driver's license.  (See section 1 *ante*).  After losing his licence, Mr. Cleary sought employment at New Hudson Manor, an adult care facility licensed by the State of Michigan.  New Hudson Manor accepted Mr. Cleary for employment and proceeded to conduct a state-mandated a background check on Mr. Cleary, using the DHS's web site.

In response to New Hudson Manor's query, the DHS responded by matching Mr. Cleary's name to the incarceration records of Bennie Ray Parker, records which disqualified Mr. Cleary from employment.

While the State claims that this information was required to be maintained and delivered, its witnesses concede that the statute provides no specific matching procedures, and those have been left to the DHS itself.  Those procedures – used in this case consistent with the instructions of the DHS – to falsely identify Mr. Cleary as a career criminal (Bennie Ray Parker) who had from time to time used Mr. Cleary's name as an alias.  Defendants have offered no any explanation of why these agencies chose to use the matching criteria employed rather than checking all of the

12

identification information provided to match against Mr. Cleary's actual identity.   While the State would ordinarily have offered individuals like Mr. Cleary an opportunity to challenge data that disqualified them from employment at a state-licensed facility, DHS refused to provide that opportunity to Mr. Cleary in this case because the matching procedures and data delivered by the DHS itself, did not allow Mr. Cleary to progress to the second stage of application where a fingerprint check would have easily demonstrated he had no connection with the crimes that DHS falsely associated with Mr. Cleary.

Second, the substantive Due Process rights under the Constitution protect individuals from arbitrary and capricious action by government officials.   See, *Pittman v. Cuyahoga Cnty. Dep't of Children and Family Servs.*, 640 F.3d 716, 728 (6th Cir.2011) ("Substantive due process serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used."   In this case, the combined practices of the State's information technology have operated systematically to needlessly oppress Mr. Cleary.   He has been arrested, maligned, dragged to court, prohibited from driving, barred from working in his chosen profession, forced to hire attorneys, required to pay fines and prohibited form working in yet a second profession, all based on the fact that the State's computers recognize Mr. Cleary as Bennie Ray Parker.

The State has put in place no remedies for Mr. Cleary to either prevent further harm, or to directly correct it as it arises.   The suspension of Mr. Cleary's license and prohibition on his working in an adult care facility are only the most recent installments in the State's abuse of Mr. Cleary, all arising from the State's refusal to institute any procedure to identify both the victims and the perpetrators of identity theft.   This refusal has effectively shifted to Mr. Cleary the burden of

13

disproving his guilt at every turn where his name has been associated with the crimes of Mr. Parker. Given the widespread availability of fingerprinting, biometric identification, body markings, and photographic evidence – all of which could be used to differentiate Mr. Cleary from Bennie Ray Parker – Michigan's continued reliance on name matches represents the height of arbitrary and capricious action.  This same conduct presents a genuine issue as to whether the State's action "shocks the conscience."   See, *Harris v. City of Akron*, 20 F.3d 1396, 1405 (6th Cir.) ("This court has recognized two types of substantive due process violations: (1) official acts that are unreasonable and arbitrary and 'may not take place no matter what procedural protections accompany them,' and (2) official conduct that 'shocks the conscience.' ") (quoting *Wilson v. Beebe*, 770 F.2d 578, 586 (6th Cir.1985) ( en banc )), cert. denied, --- U.S. ----, 115 S.Ct. 512 (1994).

Under these facts Mr. Cleary has asserted a valid substantive Due Process claim based on arbitrary and capricious action by the state, and action that shocks the conscience.

**b.  Mr. Cleary has presented a question of fact as to whether the action of State proximately caused the harm to Mr. Cleary.**

In defense of Mr. Cleary's official capacity claim, the State claims that Mr. Cleary cannot show that the State proximately caused the harm to him. In specific, the State claims that its actions were mandated by statute and thus Mr. Cleary cannot show that any official action caused him harm. This argument fails for two reasons.

First, the harm to Mr. Cleary arises not from the fact that the State is required to take action to suspend the drivers' license of criminals or bar criminals from working in state-licensed social service centers.  Rather, the harm  to Mr. Cleary arises from the manner in which each of the State's administrative agencies correlates the data of conviction to Mr. Cleary.  In the case of the Secretary of State, that agency does not use any form of readily-available biometric, finger-printing or

14

photographic matching– even when there have been past reported and verified instances of identity theft. Rather, the Secretary of State resorts to a 2-of-3 match of limited data. It ignores data that could otherwise be used to catch errors in its processes. Similarly, the DHS matches the names of job applicants against not only the primary identity of criminals, but also against the aliases of those individuals. This matching process *virtually insures* that the victims of identity theft will be barred from employment, without any process for correction or appeal. While the State mandates these checks, nothing in the law requires these facially unreasonable matching processes. As such, the harm to Mr. Cleary arises not from the statutory mandates, but the arbitrary and capricious administration of those requirements.

Second, the record evidence amply demonstrates that Mr. Cleary has suffered harm as a result of the action of the State. Mr. Cleary has sought, been accepted for and terminated from employment as a result of the actions of the State (Exhibit 5). As such, Mr. Cleary has presented a genuine issue of material fact as to whether he has suffered harm.

**3.**     **Mr. Cleary has presented a question of fact as to whether Secretary of State Johnson and Mr. Heyns are entitled to qualified immunity**

A public official may raise a *qualified immunity* defense to Section 1983 claims where that official has engaged discretionary functions.     *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *McKinley v. City of Mansfield*, 404 F.3d 418, 429 (6th Cir.2005).   The court resolves the defense in a two-step inquiry. First, the court must determine (1) whether the facts, viewed in the light most favorable to the plaintiff, show a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In determining whether the right in question is "clearly established," the right must be sufficiently clear that a reasonable official would understand that they have violated the law.

15

*Cochran v. Gilliam*, 656 F.3d 300 (6th Cir. 2011).  See also, *Armstrong v. City of Melvindale,* 432 F.3d 695 (6th 2006); *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893 (6th Cir. 2004).

In order to make this determination, the court may look to court holdings or general reasoning that a court employs.  *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir.2003) (citing *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002)).   This examination employs a standard of objective reasonableness, analyzing claims of immunity on a fact-specific, case-by-case basis.  *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008) *citing, Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir.1995).  Once invoked by the defendant, Plaintiff bears the burden of establishing a question of fact as to this defense.  *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir.2006).

In this case, Ms. Johnson and Mr. Heyns have raised the *qualified immunity* defense, and make two specific claims in their defense.  First, citing their prior arguments they reassert that Mr. Cleary has not asserted any right or constitutionally protected interest, let alone one that has been "clearly established."  Second, the Defendants claim that the Court may not hold them liable for the actions of their employees.  Case law permits Mr. Clearly to hold Defendants liable for their own actions, as well as those of employees by encouraging, implicitly authorizing, approving or knowingly acquiescing in the employees actions.  *Flagg v. City of Detroit*, --- F.3d ----,  (6th Cir. 2013) *citing*, *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.1999).  In this case, the record shows that each of the Defendants  had notice of the defects in their processes, which violate clearly established rights, and each has affirmatively refused to act to remedy the situation for Mr. Cleary.  A discussion of these argument follows.

a.   **Ms. Johnson continues to violate Mr. Cleary's "clearly established" constitutional rights by continuing to refuse to provide Due Process in the form of its own hearing for the deprivation of Mr. Cleary's license.**

16

Mr. Cleary claims that SOS Johnson has continued to withhold his driving privileges without Due Process after receiving notice that he had never received an opportunity for a hearing on his suspension.  He alleges that – even now – SOS Johnson has refused to make any process available to him for return of his driving privileges.  In her brief, SOS Johnson argues that she did not violate Mr. Clearly's rights, because she is not responsible for the actions of her employees.  But, Mr. Cleary may establish a supervisor's responsibility by showing "knowing acquiescence" in violation of rights.  Through his initial complaint in this case Mr. Cleary notified SOS Johnson of the fact that she had wrongfully taken, and continued to withhold Mr. Cleary's license without Due Process.  (R.1). In specific, Mr. Cleary's complaint alleged that the Secretary of State refused to provide Due Process for the continued withholding of his driving privileges (Complaint, R. 1,¶ 83).  In response, Ms. Johnson denied the allegations.  (Answer, R.9, ¶ 83).  Similarly, Mr. Cleary's complaint advised of his claims for the continued withholding of his license without ever providing a hearing.  (R.1 ¶ 121(b).  These allegation are sufficient to place SOS Johnson on notice of the fact that she did not provide Due Process since the outset of this litigation.  As the matter progressed, Ms. Johnson designated Fred Bueter to testify concerning the "Process" that Ms. Johhnson made available to Mr. Cleary.  Mr. Bueter (speaking on behalf of Ms. Johnson) testified that the "Process" provided was for Mr. Cleary to appeal the decision of the Georgia Court (Exhibit 4, pp. 53, 67-68, 76-78).  In this deposition, Mr. Bueter spoke on behalf of Ms. Johnson, and acknowledged that the only process made available to Mr. Cleary was appeal "in Georgia" pursuant to the notice sent on August 26, 2011.  (Exhibit 4, p. 78; R. 28-8).  This letter further  required Mr. Cleary to attach the citation or order, something which Mr. Cleary himself never received.  A review of this notice reveals no separate appeal right through the Secretary of State's office.  Rather, the only appeal referenced is

17

an appeal of the underlying conviction, not the Secretary of State's suspension.  (R28-8).

In relation to the claims at hand, Ms. Johnson has had notice – in the most formal manner possible, a summons and complaint – since the inception of this suit of Mr. Cleary's claim that she failed to provide Due Process to Mr. Cleary.   Mr. Cleary's complaint puts Ms. Johnson on notice that it is suspending people's Michigan licenses based on out-of-state convictions without ever providing any hearing with the State of Michigan to adjudicate Michigan's own actions.   Rather than providing that hearing or some other process for Mr. Cleary to vindicate himself, SOS Johnson has obstructed the return of Mr. Cleary's license and rejected his repeated requests to resolve this matter.   Throughout this litigation Ms. Johnson has taken the position that appeal in Georgia provided all the "process" that Mr. Cleary was "due" under the circumstances.   Ms. Johnson has done more than acquiesce in this continued withholding of Due Process, she has fully and completely ratified those action through the obdurate defense and continued refusal to reinstate Mr. Cleary's driving privileges in the face of her own admission that Mr. Cleary never incurred the citations for which those privileges were suspended.

While Ms. Johnson acknowledges that Mr. Cleary was entitled to Due Process, no reasonable public official could believe that what was offered by her could satisfy its Due Process obligations. By simply referring Mr. Cleary to the State of Georgia, without providing a case number, venue or information to assist him, the Secretary of State offered what was effectively no remedy.  Ms. Johnson has failed to cite even a single case supporting this argument, namely that Michigan satisfies its Constitutional obligations to Mr. Cleary by passing the buck to Georgia.

Moreover, Michigan law requires that the Secretary of State itself provide an administrative mechanism for drivers to challenge suspensions, a process from which a driver may take a judicial

18

review.  M.C.L. §  257.322.  Ms. Johnson makes these procedures available to persons whose privileges she suspends based on in-state violations, yet she provides no similar relief for drivers who she suspends based on out-of-state violations.   No public official who makes these hearings available for in-state suspensions, could rationally conclusde that they could deny the same process to those suspended for out-of-state convictions.

In the face of thirty years of US Supreme Court jurisprudence and a Michigan statute on point, and the acknowledgment throughout this case that Due Process required a hearing, no reasonable public official could believe that offering the process identified in the August 26, 2011 notice could ever satisfy Due Process.  The notice fails to meet even the most rudimentary elements of Due Process, and yet Ms. Johnson continues to refuse to provide a hearing and restoration for Mr. Cleary – all the while acknowledging that Mr. Cleary is the victim of a fraud and was never convicted of the underling crimes at issue. Under these circumstances, Ms. Johnson is not entitled to *qualified immunity* for her continued refusal to provide a hearing to Mr. Cleary.  For these reasons, the Court should deny Ms. Johnson's motion for summary judgment on her *qualified immunity* defense.

     **b.**    **Mr. Heyns continues to violate Mr. Cleary's "clearly established" constitutional rights by continuing to associate Mr. Cleary with the records used by the State of Michigan to conduct background checks.**

As with the Secretary of State, the Directory of the DOC has been on notice of the issues relating to Mr. Cleary since the outset of this suit.   In the opening complaint, Mr. Cleary notified all parties that he had been denied employment in his second profession as a result of data that formally associated him with the criminal records of a known career criminal in the OTIS database operated by the DOC and Director Heyns (R. 1 at ¶¶ 5, 77-80, and 89).  This data – though rife with

erroneous name associations and inaccurate identification – serves as one of the primary tools to allow DHS and other data partners of the stated to conduct background checks.  Because established US Supreme Court precedent cleary prohibits defamatory speech to deny employment, no reasonable public official could have concluded that allowing this facially false and data to serve this critical function could be lawful or appropriate.  As such, Mr. Cleary has met his burden of demonstrating a genuine issue of material fact to support his claim over the *qualified immunity* defense of Director Heyns.

### Conclusion

For the reasons set forth in the brief above, Mr. Cleary requests that the Court deny the motion for summary judgment and permit ths matter to proceed to trial on the merits.

Respectfully Submitted,

By:  s/ Ian B. Lyngklip
Ian B. Lyngklip P47173
LYNGKLIP & ASSOCIATES
CONSUMER LAW CENTER, PLC
Attorney for Randy Cleary
24500 Northwestern Highway, Ste. 206
Southfield, MI 48075
PHONE:  (248) 208-8864
Ian@MichiganConsumerLaw.Com

Dated: June 4, 2013

### Certificate of Service

I hereby certify that on June 4, 2013, I electronically filed the foregoing paper with the Clerk of the Court and served this document on the following parties:

| Party | Manner Served |
| --- | --- |
| Joseph Froehlich | Electronically via the CM/ECF System |
| Assistant Attorney General | |

20

PO Box 30736
Lansing, MI  48909


Respectfully Submitted,


By:  s/ Ian B. Lyngklip
Ian B. Lyngklip P47173
LYNGKLIP & ASSOCIATES
CONSUMER LAW CENTER, PLC
Attorney for Randy Cleary
24500 Northwestern Highway, Ste. 206
Southfield, MI 48075
PHONE:  (248) 208-8864
Ian@MichiganConsumerLaw.Com

Dated: June 4, 2013

21